# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01143-COA

**ROBERT DONALD EHRHARDT III**                                          **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/15/2021 |
| TRIAL JUDGE: | HON. M. BRADLEY MILLS |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MERRIDA COXWELL |
| | COURTNEY DENISE SANDERS |
| | CHARLES RICHARD MULLINS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/02/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., LAWRENCE AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     A Rankin County grand jury indicted Robert Donald Ehrhardt III on five counts of child exploitation pursuant to Mississippi Code Annotated section 97-5-33(5) (Rev. 2020). After a four-day jury trial beginning on June 14, 2021, Ehrhardt was found guilty of child exploitation in all five counts of the indictment. He was sentenced to serve forty years in the custody of the Mississippi Department of Corrections on each of the five counts, to be released after serving twenty years on each count. All sentences were ordered to run concurrently. Ehrhardt was also ordered to register as a sex offender and to be placed on supervised probation for a period of five years upon his release from custody. Ehrhardt

appealed.

## FACTS AND PROCEDURAL HISTORY

¶2.     On December 21, 2016, Microsoft sent twenty-eight cybertips to the National Center for Missing and Exploited Children (NCMEC).  All twenty-eight cybertips were generated as a result of Skype[1] conversations between a Skype user with the username Qa.xi01 (Qa) and two other Skype users, Jasrob47 and jonesjason327.  Twenty-eight images containing child exploitation material were uploaded and exchanged between these users.  The cybertips generated by Microsoft included the Internet Protocol (IP) address that had been used in exchanging the images at issue.

¶3.     On February 3, 2017, NCMEC sent all twenty-eight cybertips to the Mississippi Attorney General's Office.  The case was assigned to Investigator Wayne Lynch who served a grand jury subpoena on Comcast, the internet provider, for information regarding the IP address associated with the tips.  The subpoena requested that Comcast identify the name and address of the party responsible for paying for the internet services associated with the IP address used to exchange the child exploitation material during the Skype chats on December 21, 2016.  On June 15, 2017, Comcast identified Ehrhardt as the person paying for the service associated with the IP address at issue, and identified the physical address for the IP address as 871 Willow Grand Circle, Brandon, Mississippi.

¶4.     A search warrant was obtained and executed on the Willow Grand Circle address.

---

[1] Skype is a telecommunication application operated by a division of Microsoft. Skype is available on both desktop and mobile platforms and has multiple capabilities such as file transferring, instant messaging, and video conferencing.

Twenty-four items were taken from Ehrhardt's home, including computers, external hard drives, Amazon Echo devices, cameras with SD cards, an Apple iPhone, and an Apple iPad. Upon a forensic examination of these items, child exploitation material was found on an HP computer tower, a Hitachi hard drive, a Western Digital hard drive, an Apple iPhone, and an Apple iPad. Subsequently, the matter was presented to a Rankin County grand jury, which returned an indictment charging Ehrhardt with five counts of child exploitation. After a jury found Ehrhardt guilty on all five counts of the indictment, he filed a "Motion for Judgment Notwithstanding the Verdict, or in the Alternative, for a New Trial." The motion was denied, and Ehrhardt timely perfected this appeal.

**ANALYSIS**

¶5.     On appeal, Ehrhardt claims that his federal and state constitutional rights were violated when the circuit court denied his motion for a mistrial during the direct rebuttal examination of Investigator Charlie Rubisoff, and also by failing to suppress items found in his home during the execution of a search warrant. Ehrhardt also alleges that the circuit court committed reversible error when it denied his motion for a judgment notwithstanding the verdict (JNOV) or a new trial.

> **I.      Did the circuit court violate Ehrhardt's federal and state constitutional rights by denying his motions to suppress the items found in the search of his home?**

¶6.     Our standard of review for the denial of a motion to suppress is set forth in *Sutton v. State*, 238 So. 3d 1150, 1154-55 (¶13) (Miss. 2018):

> "'In reviewing a magistrate's finding of probable cause, this Court does not make a de novo determination of probable cause, but only determines if there

3

was a substantial basis for the magistrate's determination of probable cause.'" *Roach v. State*, 7 So. 3d 911[, 917 (¶12)] (Miss. 2009) (quoting *Petti v. State*, 666 So. 2d 754, 758 (Miss. 1995)). Our review is guided by the totality-of-the-circumstances analysis established by the United States Supreme Court. *Lee v. State*, 435 So. 2d 674, 676 (Miss. 1983) (citing *Illinois v. Gates*, 462 U.S. 213, 238-39, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983)). The United States Supreme Court in *Gates* detailed the test:

> **The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.** And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Gates*, 462 U.S. at 238-39, 103 S. Ct. 2317 (alteration in original) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S. Ct. 725, 736, 4 L. Ed. 2d 697 (1960), *overruled by United States v. Salvucci*, 448 U.S. 83, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980)). In making this determination, "'this Court looks both to the facts and circumstances set forth in the affidavit for search warrant and as well, the sworn oral testimony presented to the issuing magistrate.'" *Petti*, 666 So. 2d at 757 (quoting *Williams v. State*, 583 So. 2d 620, 622 (Miss. 1991)). Further, "[t]he information necessary to establish probable cause 'must be information reasonably leading an officer to believe that, then and there, contraband or evidence material to a criminal investigation would be found.'" *Id*. (quoting *Rooks v. State*, 529 So. 2d 546, 554-55 (Miss. 1988)).

(Emphasis added).

¶7. On February 20, 2018, Lynch presented an affidavit for a search warrant, along with a statement of underlying facts and circumstances, to a Rankin County justice court judge for authorization to search Ehrhardt's home for electronic devices and evidence of child exploitation material. The search warrant was issued that day and was executed on February 22, 2018, by Lynch, Investigator Jay Houston, Investigator Jack Lilly, Investigator Rubisoff,

and several deputies with the Rankin County Sheriff's Office. Five of the devices seized during the search were found to contain child exploitation material.

¶8.     Ehrhardt filed two motions to suppress evidence. First, Ehrhardt claimed that the evidence seized during the search of his home should be suppressed because the information relied upon by the State was stale. Next he argued the evidence should be suppressed because the State did not show that the information it received from other sources was reliable. We will address these issues separately below.

### A.     Staleness

¶9.     Ehrhardt argues that the information supporting the issuance of the search warrant was stale because nearly fourteen months had passed between the date that the IP address was accessed as previously discussed, and the date that the search warrant was issued and executed. Ehrhardt points out that the State presented no evidence of any other illegal activity related to the IP address during that fourteen month period. Ehrhardt contends that there was nothing presented by the State to connect him[2] to any illegal conduct, except for someone's single, limited use of the IP address assigned to Ehrhardt's home router over a year earlier. Ehrhardt urges this Court to find that, because there was no more recent information that supported the issuance of the search warrant, the information the State relied upon was stale and the evidence should have been suppressed.

---

[2] It is important to note that at the time the search warrant was issued, probable cause for the search was directed at the IP address and all computers, cellular devices, electronic equipment, and other items of physical evidence related to the IP address that may contain evidence of child exploitation. The search warrant was not directed toward any particular person's use of the IP address.

5

¶10. Similarly, in *Renfrow v. State*, 34 So. 3d 617, 626 (¶21) (Miss. Ct. App. 2009), Renfrow argued that there was no probable cause to issue a search warrant because the events that led the investigator to obtain the warrant occurred "nine or ten months" prior. This Court held:

> [I]t was reasonable for the judge who issued the search warrant to conclude that images on a computer could still be recovered by forensic methods nine or ten months after the children saw them. . . . Accordingly, because the images were stored on a computer, the probable cause for [the investigator's]search warrant was not rendered stale by the passage of time.

*Id*. at 627 (¶26).

¶11. In the case at hand, Lynch's statement of underlying facts and circumstances represented to the justice court judge that the items sought in the warrant could be used as storage devices for the illegal images and/or could be used as an instrumentality to access the internet to either download or upload illegal images. The judge was further advised that "child pornographers" commonly store such images as computer files. Lynch described how a forensic examination could recover illegal images from devices even if they were "hidden, erased, compressed, password-protected, or encrypted filed." Applying this Court's decision in *Renfrow* to the facts of this case, Ehrhardt's argument regarding the staleness of the information contained in the cybertips is without merit. It was reasonable for the judge to believe that any child exploitation material Ehrhardt had stored on his electronic devices at the time of the NCMEC cybertip could still be found on his devices at the time the warrant was issued.

## B. Reliability

¶12. Ehrhardt argues that Lynch relied upon information provided by Microsoft and NCMEC to establish probable cause for the issuance of the search warrant for his residence. He contends that "[w]hile the agent verified the content of images prior to seeking the warrant, the process used by Microsoft to flag the images was never explained nor vouched for in the affidavit." Because there was no evidence to support the reliability of the "cybertips," Ehrhardt contends that his motion to suppress should have been granted.

¶13. Ehrhardt cites *State v. Woods*, 866 So. 2d 422 (Miss. 2003), *Chesney v. State*, 165 So. 3d 498 (Miss. Ct. App. 2015), and *Roebuck v. State*, 915 So. 2d 1132 (Miss. Ct. App. 2005), as support for his reliability argument. He contends that because Lynch relied upon information provided by third parties and outside his personal knowledge, Lynch was required to establish that the information provided by Microsoft and NCMEC was credible or reliable before the justice court judge issued the warrant.

¶14. In *Woods*, the circuit court granted Woods's motion to suppress evidence gained by the execution of a search warrant, and the court dismissed the then-pending charge of possession of cocaine with intent to sell. *Woods*, 866 So. 2d at 425 (¶7). The State appealed, and the Mississippi Supreme Court affirmed. *Id*. at 428 (¶21). The search warrant had been issued based upon information provided to law enforcement by a female who was dating Woods at the time. *Id*. at 424 (¶¶2, 5). The female was unknown by law enforcement and had never been used as a confidential informant before. *Id*. at 426 (¶14). According to the female, she gave the information to law enforcement because "Woods 'was doing wrong and . . . she wanted [the Unit] to take care of it for her.'" *Id*. at 424 (¶5).

¶15.    In *Roebuck*, a search warrant was obtained based upon information that narcotics were being manufactured and sold at Roebuck's residence. *Roebuck*, 915 So. 2d at 1135 (¶¶3-4). The search warrant was based upon information that law enforcement received from two unknown informants. *Id*. at 1138-39 (¶¶18-19). On appeal, this Court found that neither the affidavit for a search warrant nor the oral testimony given to the issuing judge gave any information at all regarding the informants' veracity or reliability. *Id*. at 1040 (¶24). There was no evidence that they had proved to be reliable in the past, and there was insufficient efforts made to corroborate the information. *Id*.

¶16.    In *Chesney*, Police Chief Richard Sistrunk received information from John Paul Dove that Chesney was involved in an identity theft scheme. *Chesney*, 165 So. 3d at 501 (¶1). Although a victim of the scheme had made a complaint, the affidavit to obtain a search warrant for Chesney's residence was based upon the information provided by Dove. *Id*. at 505 (¶17). In finding that the search warrant was not founded upon probable cause, this Court said:

> Based on the holdings in *Woods* and *Roebuck*, we find that the threshold requirements for probable cause, to support the issuance of the original search warrant, were not met. Chief Sistrunk admitted that he had only spoken with Dove a couple of times and that he had never met him. There was nothing in the affidavit, its underlying facts and circumstances, or the testimony to establish that the information provided by the informant was credible or reliable; nor was there any testimony that Chief Sistrunk attempted to corroborate Dove's statement through an additional independent investigation.

*Id*. at 506-07 (¶21).

¶17.    The case at bar is substantially different than those relied upon by Ehrhardt. As noted above, Investigator Lynch prepared an affidavit for a search warrant and attached as Exhibit

A a "Statement of Underlying Facts and Circumstances." He presented these documents to the justice court judge in an effort to obtain a search warrant. He signed these documents under oath before the justice court judge and discussed the case with the judge under oath. He advised the judge that his investigation began as a result of computer-generated "cybertips" he received from the NCMEC.[3] He described the documentation he received as computer-generated information from the "Skype" social networking site owned by Microsoft. He evidenced his familiarity with the program by explaining how the program allowed "Skype" users to connect directly with each other to share multimedia files, share other content, and make live video calls to one another.

¶18. He testified that he viewed all twenty-eight images provided with the "cybertips" and, based upon his training and experience, he confirmed that each of the images "depicts actual children engaging in sexually explicit conduct as defined by Mississippi Law." The cybertips indicated that all twenty-eight of the illegal images were exchanged using the same IP address on December 21, 2016. He confirmed, through information received in Comcast's response to a grand jury subpoena, that the IP address at issue was leased by Comcast and was assigned to Don Ehrhardt, 871 Willow Grand Circle, Brandon, Mississippi, 39047. The justice court judge found the information was sufficient to establish probable cause and issued the search warrant. After hearing from both sides at the suppression hearing held prior to trial, the circuit judge found the information was shown to be reliable and denied the

_____

[3] During the suppression hearing there was testimony that if internet service providers, such as Microsoft, find sexually explicit materials involving children on their platform, it is mandated by federal law that they report the information to NCMEC, which will then distribute the information to the appropriate law enforcement agency.

motions to suppress.

¶19. Caselaw, however, does not treat an "informant" such as Microsoft the same as a confidential informant in a narcotics case or other unknown informants. Microsoft found evidence of illegal activity on the platform that it owned and operated. It then reported the information it obtained from its platform to NCMEC, as it was required to do by law. NCMEC then provided that information to the appropriate law enforcement agency.

¶20. In *Wolf v. State*, 281 So. 2d 445, 448-49 (Miss. 1973), law enforcement was informed by Wolf's neighbor that he had observed what he believed to be marijuana growing on Wolf's land. *Id*. The neighbor was told that a search of Wolf's land was not possible without more information. *Id*. Subsequently, the neighbor went onto Wolf's land and took a few of the plants off the property. *Id*. He carried the plants to law enforcement who determined that they were marijuana plants. *Id*. Law enforcement then obtained a search warrant based upon the information provided by the neighbor. *Id*. Law enforcement did nothing more to verify what they were told by the neighbor, or to establish the neighbor's reliability. *Id*. While law enforcement verified that the plants were marijuana plants, the only information they possessed that the plants came from Wolf's land was the statement by Wolf's neighbor. *Id*. Wolf moved to suppress the evidence subsequently seized upon execution of the search warrant because the warrant was issued based only upon information from the neighbor whose reliability and credibility were unknown. *Id*. In affirming the circuit court's denial of the motion to suppress, the supreme court reasoned:

> A similar argument based upon *Aguilar* [*v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964),] was dealt with by the United States Fifth

10

Circuit Court of Appeals on March 23, 1972, in *United States v. Bell*, 457 F. 2d 1231, 1238-1239 (5th Cir. 1972), as follows:

> Although there is much sound and fury between the parties as to the existence of probable cause to arrest, we choose not to venture into the mostly visceral concept of probable cause, for a specter has arisen in this case that deserves to be laid to rest. **It is now a well-settled and familiar concept, as enunciated by *Aguilar* and *Spinelli* [*v. United States*, 393 U.S. 410 (1969)], that supporting affidavits in an application for a search warrant must attest to the credibility of an informant and the reliability of his information.** *See also United States v. Harris*, 403 U.S. 573, 91 S. Ct. 2075, 29 L. Ed. 2d 723 (1971). **We have discovered no case that extends this requirement to the identified bystander or victim-eyewitness to a crime, and we now hold that no such requirement need be met.** The rationale behind requiring a showing of credibility and reliability is to prevent searches based upon an unknown informant's tip that may not reflect anything more than idle rumor or irresponsible conjecture. Thus, without the establishment of the probability of reliability, a 'neutral and detached magistrate' could not adequately assess the probative value of the tip in exercising his judgment as to the existence of probable cause. Many informants are intimately involved with the persons informed upon and with the illegal conduct at hand, and this circumstance could also affect their credibility. None of these considerations is present in the eyewitness situation such as was present here. Such observers are seldom involved with the miscreants or the crime. Eyewitnesses by definition are not passing along idle rumor, for they either have been the victims of the crime or have otherwise seen some portion of it. A 'neutral and detached magistrate' could adequately assess the probative value of an eyewitness's information because, if it is reasonable and accepted as true, the magistrate must believe that it is based upon first hand knowledge. Thus we conclude that *Aguilar* and *Spinelli* requirements are limited to the informant situation only.

While it is true that the officers who executed the affidavit had not been previously acquainted with Wolf's neighbor who supplied the information, either personally or officially, and had no previous experience as to his reliability based on former tips, or otherwise, in this case the informant was an

'eyewitness' to the growing of the marijuana, which he had observed simply by looking across the imaginary line separating his from Wolf's property. His statements with respect to it were supported and borne out when he took several of the plants to the police where it was identified by them as being marijuana. We conclude that the information in the hands of the officers was ample, and was sufficiently set out in detail in the affidavit, to justify a finding of probable cause and the issuance of the warrant. The trial court did not err in overruling the motion to suppress.

*Wolf*, 281 So. 2d at 448-49 (emphasis added). Following that authority, in *Walker v. State*, 473 So. 2d 435, 438 (Miss. 1985), the supreme court reasoned:

With reference to this part of the affidavit, appellant contends that the reliability of the eyewitness to the shooting was not shown and that this was necessary. We have considered this argument in at least three cases and have held that, when information is furnished by an eyewitness rather than from an informant, there is no need to show the party supplying the information was a credible person. *Foley v. State*, 348 So. 2d 1034 (Miss. 1977); *Holt v. State*, 348 So. 2d 434 (Miss. 1977); and *Wolf v. State*, 281 So. 2d 445 (Miss.1973).

*See also Bailey v. State*, 981 So. 2d 972, 976 (¶13) (Miss. Ct. App. 2007) (stating that the "rationale for the victim or eyewitness exception is that the statements of such eyewitnesses are based on their own observation and thus are not likely to reflect mere 'idle rumor or irresponsible conjecture'" (quoting *Walker v. State*, 473 So. 2d 435, 438-39 (Miss. 1985))).

¶21. We find that the information supplied by Microsoft, through NCMEC, was in the nature of a bystander or victim-eyewitness as described above. Microsoft found evidence of criminal activity on the platform that they own and manage. Clearly, the information provided by Microsoft was "more than idle rumor or irresponsible conjecture." *Wolfe*, 281 So. 2d at 448. Lynch verified the nature of the images and that the identified IP address was located at a residence in Rankin County, Mississippi. We find that under the totality of the circumstances, there was a "substantial basis" for the justice court judge to find that there

12

was probable cause to believe that evidence of child exploitation could be found at Ehrhardt's residence. This issue is without merit.

**II.     Was Ehrhardt's federal and state constitutional right to a fair trial violated when the circuit court denied his motion for a mistrial?**

¶22.    "The decision to grant a mistrial rests within the sound discretion of the trial court. This Court will reverse the trial court's decision only for an abuse of discretion." *Osborne v. State*, 54 So. 3d 841, 843 (¶4) (Miss. 2011) (citation omitted). "A mistrial is not warranted every time the jury is exposed to inadmissible evidence. The trial court may only grant a mistrial when the harm done would render the defendant without hope of receiving a fair trial. A mistrial is appropriate when misconduct by a party creates substantial and irreparable prejudice." *Lepine v. State*, 10 So. 3d 927, 941 (¶39) (Miss. Ct. App. 2009) (citations and internal quotation marks omitted).

¶23.    Ehrhardt claims that the circuit court violated his right to a fair trial by denying his motion for a mistrial after Investigator Rubisoff made an improper and inflammatory comment during the State's rebuttal examination. The following exchanged occurred between the State and Rubisoff during his rebuttal examination:

> Q.     You heard the Defendant's testimony about possibilities that his devices were compromised. Did you see any evidence of that?
>
> A.     I did not. And I want to discuss that a little bit. One of my obligations is to find the facts and investigations. That's the truth. I've got an obligation to try to disprove as much as prove. In the course of this investigation, I've looked for what we call exculpatory information, information that may indicate that Mr. Ehrhardt is not responsible for what the State has alleged has occurred. And in the course of this investigation, I made a thorough review of the information on these items that you see before you. The defense counsel has gotten their

own expert to look at these items, to review the information, had opportunities to produce a report in support of the existence of an intrusion --

Before Rubisoff could give any further testimony about the defense's expert, defense counsel objected to Rubisoff's testimony and moved for a mistrial. Defense counsel also requested that the jury be instructed to disregard Rubisoff's testimony and that a written jury instruction be given regarding the burden of proof in a criminal trial. The State argued that it was not its intention for Rubisoff "to go there with that question." After a brief bench conference, the circuit court instructed the jury as follows:

> Ladies and gentlemen, sidebar consulting with counsel for the State and the Defendant, I believe that the testimony just proffered about a witness that did not testify in this case or an expert that didn't testify in this case or anything that hasn't been put into evidence was improper and that should be disregarded. You're not to take that into consideration, okay? With that said, I'll let [the State's attorney] continue her questioning.

Ehrhardt claimed that Rubisoff's testimony improperly shifted the burden of proof and was highly prejudicial. He claimed that a jury instruction could not cure the damage done by Rubisoff's statement. The State argued that Rubisoff's unsolicited statement was brief and that an instruction to the jury to disregard the statement would be appropriate. Ehrhardt's motion for a mistrial was ultimately denied. During the jury instruction conference, defense counsel requested that the jury be instructed again concerning Rubisoff's statement. Without objection by the State, the court gave the following instruction:

> During examination of the State's expert witness, you heard him allege that the Defense had an expert witness examine the data in this case and come to certain conclusions. This was improper testimony by the State's expert witness.

14

The type of experts commented on by the State's witness are called consulting experts, and they do not share their opinions about the case with the State of Mississippi. You must entirely disregard this improper testimony from the State's expert witness.

Further, the State's expert witness commenting that the Defense did not call its consulting expert to testify, seemed to imply that the burden of proof had shifted from the State to the Defense. That comment was improper. You must entirely disregard any implication or effort by the State to shift its burden to the Defense through that comment. The burden of proving the Defendant guilty beyond a reasonable doubt is always with the State. The Defendant never has to prove his innocence.

¶24.   In *Bankhead v. State*, 299 So. 3d 853, 858-59 (¶21) (Miss. Ct. App. 2020), this Court

explained:

> The trial judge "is in the best position to determine if a remark is truly prejudicial" and has "the discretion to determine whether [an] objectionable comment is so prejudicial that a mistrial should be declared." *Reynolds v. State*, 585 So. 2d 753, 755 (Miss. 1991); *Hampton v. State*, 910 So. 2d 651, 655 (¶9) (Miss. Ct. App. 2005). "When serious damage does not result, the judge should admonish the jury to disregard the impropriety." *Pittman v. State*, 928 So. 2d 244, 249 (¶12) (Miss. Ct. App. 2006) (citing *Hoops v. State*, 681 So. 2d 521, 528 (Miss. 1996)). It is presumed the jury follows the trial court's instructions. *Puckett v. State*, 737 So. 2d 322, 347 (¶72) (Miss. 1999).

In the case at hand, the circuit court determined that the State did not purposefully solicit Rubisoff's improper testimony. The circuit court further determined that Ehrhardt's timely objection prevented any irreparable harm. Not only did the judge immediately direct the jury to disregard Rubisoff's improper testimony, he also gave the jury a written instruction addressing the matter. We presume the jury followed the court's instruction. Therefore, Ehrhardt's argument regarding the denial of his motion for a mistrial is without merit.

### III. Did the circuit court err in denying Ehrhardt's motion for a JNOV or alternatively a new trial because the verdict was against the overwhelming weight of the evidence?

15

### A. Motion for JNOV and Sufficiency of the Evidence

¶25. "A motion for a JNOV challenges the legal sufficiency of the evidence. The standard of review is de novo. The reviewing court will affirm the denial of the motion when substantial evidence supports the verdict. Evidence will be reviewed in the light most favorable to the verdict." *Winner v. CSX Transp. Inc.*, 100 So. 3d 478, 486 (¶28) (Miss. Ct. App. 2012) (citations omitted).

¶26. Ehrhardt alleges that the State failed to present sufficient evidence to convict him of the crimes for which he was charged. While it is undisputed that there was child exploitation material on his devices, Ehrhardt claims that without evidence that he knowingly possessed the child exploitation material, the evidence was insufficient to support the verdict. Ehrhardt claims that his devices were hacked and that he had no knowledge of the presence of child exploitation material. However, the State alleges that the information recovered from multiple devices in Ehrhardt's possession clearly proved that Ehrhardt had knowledge that the material was present.

¶27. On February 22, 2018, twenty-four items were taken from Ehrhardt's residence, including computers, external hard drives, Amazon Echo devices, cameras with SD cards, an Apple iPhone, and an Apple iPad. Child exploitation material was found on five of those devices: an HP computer tower, a Hitachi hard drive, a Western Digital hard drive, an Apple iPhone, and an Apple iPad. Testimony at trial showed that from those five devices, sixty-nine images were found on the HP tower, 281 files were found on the Hitachi hard drive, twenty-seven images and eight video files were found on the Western Digital hard drive,

16

thirty-five images were found on the Apple iPhone, and thirteen videos and five images were found on the Apple iPad. Approximately 317 images were discovered across all of the devices with creation dates dating back as far as 2008. When Rubisoff was asked at trial why he believed that Ehrhardt's devices had not been hacked, he testified as follows:

> The primary reason I believe that, these items were collected from Mr. Ehrhardt's home; they were in use by Mr. Ehrhardt at the time of the seizure; they represent a variety of technologies, a variety of systems that if we were to entertain that he was hacked would describe almost a fantastical level [of] technical skill and [prowess]. I'm not exaggerating this when I say this because the existence of such hacking technology could potentially have a shift on geo politics in the world. This is like building a hydrogen bomb to warm up a hot pocket. You don't have to go through all of this work breaching Windows systems, XP and Windows 10. Cutting edge technology is in place at the time with Apple because they're iOS devices. [T]o get child pornography, unfortunately, it's not particularly difficult to acquire this type of horrid material. So because of the variety of devices involved, because of the continued use of Mr. Ehrhardt of these devices, because of his expertise and training and experience in technical matters, no, it's not my opinion that this is hacking at all.

He further testified:

> Again, revisiting some of my earlier testimony, we have a number of separate devices. We have Windows computers, both Window XP and Windows 10. They are functionally and separate operating systems, different technologies. In order to exploit those systems, you're going to have to have an exploit or a virus or some type of program or process that will provide access to that specific system. In addition to the separate Windows systems, we also have Apple devices. And the breadth of the activity, so this, again, spans for many years, many devices, and the lack of any shared characteristics among the devices other than the ownership by Mr. Ehrhardt leads me to think that this is not hacking.

Rubisoff also testified that he was able to extract pictures from Ehrhardt's vault storage on his iPhone, which was dually encrypted by a phone pass code (2020) as well as a similar second passcode (3030). The second passcode was retrieved through an examination of a

17

different device, Ehrhardt's iPad. Ehrhardt admitted that he set up the storage vault on his iPhone to store pictures of his dog and denied knowledge of child exploitation material contained in the vault. The recovery of Facebook and URL records dating back to March 28, 2010, showed contemporaneous activity between Ehrhardt's Facebook account and internet searches for child exploitation material. More specifically, records showed that Ehrhardt's Facebook profile was accessed and then a file containing "preteen hard core identifiers" was viewed within five minutes. Another such contemporaneous search occurred on October 28, 2010. When Rubisoff examined Ehrhardt's computer to search for the Skype application implicated in the cybertip, Skype was no longer installed; however, there was Skype-related application data still stored to the computer in the app data area where a Skype program would go to make reference to database files. Rubisoff determined that a program called CCleaner had been installed on Ehrhardt's computer. CCleaner is a software program made to clean computers and essentially wipes information like log files off the computer on which it is installed.

¶28. Finally, there was no evidence that anyone other than Ehrhardt was living at 871 Willow Grand Circle, Brandon, Mississippi, when the child exploitation material was downloaded. There was no evidence that any other person had access to the devices taken from Ehrhardt's residence. Ehrhardt's defense relies solely on conjecture that someone other than Ehrhardt, with the username Qa, illegally accessed Ehrhardt's IP address to download child exploitation material that was found on five of Ehrhardt's devices differing in operating system types. Viewing the evidence in the light most favorable to the verdict, Ehrhardt's

18

argument is without merit.

### B.      Motion for a New Trial and Weight of the Evidence

¶29.    "When discussing whether the verdict is against the overwhelming weight of the evidence, the standard of review is abuse of discretion in failing to grant a new trial." *Smith v. State*, 911 So. 2d 541, 544 (¶11) (Miss. Ct. App. 2004). "In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." *Montana v. State*, 822 So. 2d 954, 967 (¶61) (Miss. 2002). "Only in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal." *Id*. at 967-68 (¶61).

¶30.    Considering the evidence previously discussed in this opinion, we find that the jury verdict was not contrary to the overwhelming weight of the evidence. We further find that to allow these verdicts to stand would not sanction an unconscionable injustice. Therefore, Ehrhardt's argument is without merit.

### CONCLUSION

¶31.    Based upon the above, we find the trial court did not err by denying the defense motions to suppress the evidence seized during the search of Ehrhardt's residence. Further, we find no error by the trial court in denying Ehrhardt's motion for a mistrial. Finally, we find that the evidence presented at trial was sufficient to support Ehrhardt's convictions, and the verdict was not contrary to the overwhelming weight of the evidence. Therefore,

Ehrhardt's convictions and sentences are affirmed.

¶32. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR.**